# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

EVELYN PARKER,

       Plaintiff,

                                  **Civil Action 2:10-cv-00971**

vs.                                **Judge Gregory L. Frost**

                                  **Magistrate Judge E.A. Preston Deavers**

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Plaintiff, Evelyn Parker, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits.  In her application, which she filed on September 14, 2006, Plaintiff alleged that she has been disabled since January 29, 2005, due to depression, migraines, rotator cuff tear, bulging disc, upper and lower back sprain, left knee, morbid obesity, diabetes, deafness in the right ear, and limited hearing in her left ear.  (R. at 92–94, 107.)

After initial administrative denials of her claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on May 11, 2009.  (R. at 23–53.)  A vocational expert also testified at the hearing.  (*Id.*)  On August 28, 2009, the ALJ issued an unfavorable decision denying benefits.  (R. at 9–22.)  This decision became the final decision of

the Commissioner when the Appeals Council denied review on August 26, 2010.[1]  (R. at 1–5.)

Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors, Plaintiff contends that the ALJ erred in rejecting the opinion her treating physician and in assessing her credibility.  Following the Commissioner's response in opposition and Plaintiff's reply, the matter is now ripe for decision.  For the reasons that follow, it is **RECOMMENDED** that the Court **REMAND** this case for further consideration consistent with this Report and Recommendation.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was forty five years old at the time of the administrative hearing, has a tenth grade education.  (R. at 103, 114.)  Her past relevant work was as a security guard, mental retardation aid, and quality parts inspector.  (R. at 48, 108, 120.)

At the administrative hearing, Plaintiff testified that she was 5'7" tall and weighed 363 pounds.  (R. at 28.)  Plaintiff reported gaining approximately forty pounds in the prior two months due to steroid treatment.  (*Id.*)  She last worked in January 2005, when she fell on the job and injured herself.  (R. at 29–30.)  Plaintiff stated that her most significant problem is her back.  (R. at 31.)  She testified to experiencing constant lower back pain due to herniated discs and arthritis.  (R. at 31.)  Her back pain radiated to her right hip and leg, and her right leg often went

---

[1]  In requesting review from the Appeals Council, Plaintiff submitted new evidence.  (*See* R. at 5, 513–69.)  Although the Appeals Council considered this evidence and included it within the record, it ultimately denied review, making the ALJ's decision the Commissioner's final decision.  The Court, therefore, cannot consider this new evidence in reviewing the ALJ's decision.  *See Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir. 2007) ("'[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.'") (quoting *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)).

numb.  (R. at 32.)  Treatment for her back included a TENS unit, Percocet, and physical therapy.  (R. at 35.)  Plaintiff indicated that she took Percocet every four to five hours.  (R. at 42.)  She used Fentanyl patches in three-day cycles, but reported that they did not help.  (*Id.*)  Plaintiff rated her pain level at a 9 to 10 on a 10 point severity scale when she was on her feet and moving around.  (R. at 33.)  She estimated that her pain reduced to 5 to 6 out of ten 10 she was sitting in a recliner.  (*Id.*)

In addition to her back pain, Plaintiff testified to having problems with her shoulder and hip.  (R. at 34.)  She noted constant pain in her right shoulder due to tendonitis.  (R. at 34–35.)  Plaintiff indicated that her range of motion in her shoulder is limited due to this pain.  (R. at 34.)  Plaintiff also reported having migraine headaches two or three times a week due to a bulge in her neck.  (R. at 37.)  Plaintiff further testified that she has no hearing in her right ear.  (R. at 37.)  She slept only two hours a night due to her sleep apnea, back, and leg pain.  (R. at 32.)  Plaintiff used a C-PAP device at night for sleep apnea, but did not find it helpful.  (R. at 38.)  Plaintiff stated that she had no energy.  (*Id.*)  Finally, Plaintiff testified to suffering from depression, noting one period where she was hospitalized because she wanted to kill herself.  (R. at 39, 43.)

Plaintiff guessed that she spent about twelve hours a day sitting in a reclined position.  (R. at 33.)  Plaintiff testified that she folded laundry and cooked, but when she cooked she sat on her walker.  (R. at 41.)  She did not go to the grocery store by herself and used a scooter when she shopped.  (R. at 41.)  She also testified that she was able to drive her car once a week to go to the grocery store.  (R. at 29.)  Plaintiff estimated that she could lift five to six pounds.  (R. at 40.)  She could only sit up for twenty to thirty minutes at a time.  (R. at 33.)

## III. MEDICAL RECORDS

A.  Dr. Connor

   1.  Treatment Notes

John C. O'Connor, M.D., of Maple Leaf Family and Sport Medicine, began treating Plaintiff in 1998.  (R. at 342.)  Dr. Connor saw Plaintiff on January 14, 2005 for complaints of lower back pain.  (R. at 300.)  On examination, her weight was 322 lbs.  (*Id.*)  Plaintiff's range of motion in her hips and knees was normal, but back movement was limited in all directions and she was "difficult to examine due to spasm."  (*Id.*)  Dr. O'Connor diagnosed low back pain and ordered an MRI.  (R. at 300–01.)  The MRI showed mild degenerative changes in the facet joints at L4-5 and L5-S1.  (R. at 226.)

In April 2005, Plaintiff reported having problems with her depression.  (R. at 299.)  Dr. O'Connor started Plaintiff on Cymbalta and recommended counseling.  (*Id.*)  In May 2005, Plaintiff stated she was doing well on her medication for depression.  (R. at 298.)

Dr. O'Connor saw Plaintiff for swollen knees on June 1, 2005.  (R. at 297.)  Dr. O'Connor noted tenderness on examination and diagnosed Plaintiff with patelleofemoral syndrome.  (*Id.*)  On June 10, 2005, Dr. O'Connor saw Plaintiff for continued knee pain.  (R. at 296.)  She had tenderness and a positive patellar compression test.  (*Id.*)  In July 2005, Dr. O'Connor examined Plaintiff after she had fallen in the tub and hurt her left shoulder.  (R. at 292.)  At this time, her weight was 346 lbs.  (*Id.*)  Plaintiff received injections for migraine pain in August and October 2005.  (R. at 287-88, 290-91.)

The records reflect that Dr. O'Connor continued to treat Plaintiff from January 2006 through November 2008.  (R. at 401-57.)  Over this period, Plaintiff received treatment for

depression; anxiety disorder, not otherwise specified; migraine; diabetes, Type II; chronic back pain; neck and shoulder pain; fatigue; chest pain; and shortness of breath. (*Id.*) Examinations generally revealed normal gait, normal spine motion and straight leg raising, normal motor strength, no sensory deficits, and symmetric reflexes. (*Id.*) Dr. O'Connor, however, frequently found vertebral spine tenderness, paraspinal spasms, and mild tenderness on the SI joints upon examination. (*Id.*) In providing Plaintiff's history, Dr. O'Connor typically described the severity of her lower back pain as moderate and he noted on multiple occasions that Plaintiff's back pain radiated down her right leg to the knee. (*Id.*) Plaintiff received medicine and injections for migraines. (R. at 404, 414, 422, 431, 433, 439, 452, 457.)

On April 24, 2006, Plaintiff reported suicidal thoughts. (R. at 432.) Dr. O'Connor recommended inpatient treatment. (*Id.*) In May 2006, Plaintiff reported some improvement in depression on her current medication.[2] (R. at 430.) Dr. O'Connor prescribed a handicap placard on September 1, 2006. (R. at 429.) On October 24, 2006, Dr. O'Connor reported that Plaintiff had depression, migraine headaches, morbid obesity, and chronic back pain. (R. at 235–36.) On January 31, 2007, an MRI of the lumbar spine demonstrated a left para-midline and foraminal disc herniation at L4-5 impinging on the left L4 nerve root and the foramen and degenerative changes in the facet joints at L4-5 and L5-S1. (R. at 277.) In August 2007, Dr. O'Connor started Plaintiff on physical therapy. (R. at 406.) At the request of Dr. O'Connor, Plaintiff underwent a stress test on October 19, 2007, due to chest pain. (R. at 319-20.) Results were normal. (R. at 320.)

---

[2] The record also reflects that Plaintiff received counseling from Adkin and Affiliates in 2006. (R. at 229–33.)

2.      Evaluations

On February 6, 2007, Dr. O'Connor submitted a form regarding Plaintiff's condition.  (R. at 272–73.)  He diagnosed Plaintiff with depression, morbid obesity, and chronic low back pain. (R. at 272.)  He reported that based on his clinical examination findings Plaintiff was in constant severe pain.  (*Id.*)  He indicated that Plaintiff was compliant with treatment.  (R. at 273.)

Dr. O'Connor responded to interrogatories on November 17, 2007.  (R. at 342–47.)  He noted that he first treated Plaintiff in 1998 and last saw her on October 17, 2007.  (R. at 342.) According to Dr. O'Connor, Plaintiff would be able to be prompt and regular in attendance; respond appropriately to supervision, co-workers, and customary work pressures; demonstrate reliability; and respond appropriately to changes in routine work setting.  (R. at 343–46.)  Dr. O'Connor opined, however, that Plaintiff was unable to withstand the pressure of meeting normal standards of work productivity and work accuracy without significant risk of physical or psychological decompensation or worsening of her physical and mental impairments; sustain attention and concentration to meet normal standards of work productivity and work accuracy; maintain concentration and attention for extended periods of time; get along with co-workers or peers without unduly distracting them; sustain ordinary routine without special supervision; work in coordination with others without being unduly distracted by them; and accept instructions and respond appropriately to criticism from supervisors.  (R. at 344–47.)  Dr. O'Connor determined that Plaintiff's depression inhibited her ability in all of these categories. (*Id.*)  Additionally, Dr. O'Connor submitted that Plaintiff would not be able to complete a normal work day or work week without interruptions from psychologically and/or physically based symptoms and perform at a consistent pace without unreasonable number and length of

6

rest periods because of her physical limitations.  (R. at 345–46.)

Dr. O'Connor also completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)" on November 19, 2007.  (R. at 338-41.)  Dr. O'Connor opined that Plaintiff could occasionally and frequently lift or carry five pounds.  (R. at 338.)  Plaintiff could stand for two hours out of an eight-hour workday and without interruption for two hours.  (*Id.*) She could sit for two hours out of eight and uninterrupted for one hour.  (*Id.*)  Dr. O'Connor indicated that he based these opinions on Plaintiff's pain.  (*Id.*)  Dr. O'Connor also opined that Plaintiff's pain and obesity resulted in a number of postural limitations.  (R. at 339.)  According to Dr. O'Connor, Plaintiff was never to climb, stoop, crouch, kneel, or crawl.  (*Id.*)  She could occasionally balance.  (*Id.*)  She had limitations in her ability to reach, handle, finger, push, and pull.  (*Id.*)  Plaintiff was restricted from heights, moving machinery, and vibration.  (R. at 340.) He concluded that Plaintiff could not perform sedentary work activity.  (R. at 341.)  She would miss work more than three times a month.  (*Id.*)  Dr. O'Connor recommended a functional capacity evaluation to fully assess Plaintiff's ability.  (*Id.*)

B.    Dr. Hussein

Consulting neurologist, Hakim A. Hussein, M.D., saw Plaintiff on referral from Dr. O'Connor on October 5, 2004, due to migraine headaches.  (R. at 194-96.)  Plaintiff reported that seven months prior her headaches changed in severity and frequency.  (R. at 194.)  She also complained of dizzy spells and jerking of her arms and legs.  (*Id.*)  Examination of the head and neck region showed tenderness in both suboccipital regions worse on the right than the left.  (R. at 195.)  Sensory examination including light touch, pinprick, vibration, and position sense were normal.  (*Id.*)  Her neck flexion, extension, and lateral rotation were normal.  (*Id.*)  She was able

to flex her back without restrictions. (*Id.*) Plaintiff was treated with a occipital nerve block on October 12, 2004. (R. at 193.) On October 14, 2004 an MRI taken of Plaintiff's brain was normal. (R. at 192.)

On November 9, 2004, Plaintiff reported a fifty percent reduction in her headaches with the nerve block. (R. at 191.) Plaintiff's EEG and the computer assisted EEG and brain mapping were normal. (*Id.*) Dr. Hussein diagnosed episodic migraine headaches, intractable; cervicalgia with possible right C5-6 radiculopathy; history of bilateral occipital neuralgia status with post bilateral occipital nerve block with good response; and obesity and possible pseudotumor cerebri. (*Id.*) Plaintiff underwent another occipital nerve block on May 9, 2005, noting that she experienced "a great response" with the previous one. (R. at 186.)

C.      Mary Rutan Hospital and Corporate Health Services

The medical records reflect that Plaintiff originally injured her right shoulder on October 7, 2004. (R. at 220.) Plaintiff fell striking her shoulder and neck. (*Id.*) Plaintiff received care from Corporate Health Services and Dr. Annette Malone from October 2004 through March 2006. (R. at 352-400.) Dr. Malone diagnosed Plaintiff with cervical sprain, shoulder sprain, and upper part thoracic sprain. (R. at 400.) Treatment and examination notes from this period reflect that Plaintiff was experiencing various symptoms including spasms, weakness, and a restricted range of motion in her upper extremity and her cervical spine. (R. at 352-400.)

A cervical spine MRI taken on December 20, 2004, revealed a small right paramidline disc bulge at C5-6 approximating the right C6 nerve root. (R. at 275, 388.) Although Dr. Malone initially reported that Plaintiff could return to work with restrictions, on January 28, 2005, Dr. Malone found Plaintiff unable to return to work. (R. at 389, 397.) In February 2005

Dr. Malone ordered an MRI of the right shoulder. (R. at 223.) The MRI revealed tendinosis and peritendinitis of the supraspinatus tendon, arthropathy of the acromioclavicular joint, and mild lateral arch stenosis. (*Id.*) On April 1, 2005, Dr. Malone prescribed a TENS unit. (R. at 380.)

Dr. Malone referred Plaintiff to the Mary Rutan Hospital Rehabilitation Center for massage and physical therapy. Plaintiff attended message therapy for neck sprain and right shoulder pain from March 3, 2005 through May 20, 2005. (R. at 348-51.) The record shows that Plaintiff missed and cancelled several appointments. (R. at 349-51.) Plaintiff reported no improvements in her right shoulder and neck pain. (R. at 348.)

The record also contains physical therapy treatment records dated from March 2005 to August 2005. (R. at 200-16.) Plaintiff attended 27 sessions for her shoulder. (R. at 201.) Physical therapy notes reflect Plaintiff was experiencing crepitus and a reduced range of motion. (R. at 214–16.) Plaintiff reported no improvement in her pain and functioning. (R. at 201, 211.)

On March 21, 2005, Plaintiff saw Robert C. Anderson, M.D. of the Mary Rutan Hospital for an orthopedic consultation. (R. at 220–21.) Dr. Anderson's examination findings included full range of motion in Plaintiff's right shoulder; no significant tenderness at the AC joint; and mildly positive impingement signs. (R. at 220.) Dr. Anderson noted that most of Plaintiff's discomfort seemed to be over the coracoid and anterior edge of the acromion. (*Id.*) Plaintiff received a corticosteroid injection and Dr. Anderson recommended six more weeks of therapy. (R. at 221.) He opined that Plaintiff should be lifting no more than 10 pounds with her right arm and shoulder if she returned to work. (*Id.*) Dr. Anderson believed that Plaintiff stood a good chance of recovering shoulder function without surgical intervention. (*Id.*)

Plaintiff presented to the Mary Rutan Hospital emergency room on April 10, 2005. (R. at

176-84.)  Plaintiff was hyperventilating and reported depression and suicidal thoughts.  (R. at 177.)  Plaintiff was discharged in stable condition after signing a contract for safety.  (*Id.*)  On April 24, 2006, Plaintiff was hospitalized for suicidal ideation.  (R. at 479–88.)  At this time she reported depression due to recent deaths in her family and marital problems.  (R. at 486.)  Plaintiff was discharged on April 28, 2006.  (R. at 484.)

On June 10, 2005, Dr. Malone reported that Plaintiff needed vocational rehabilitation. (R. at 372.)  On March 3, 2006, Dr. Malone opined that Plaintiff could return to work with restrictions.  (R. at 353.)  Dr. Malone limited Plaintiff to lifting/carrying ten pounds occasionally and five pounds frequently.  (*Id.*)  She was not to perform work above the shoulder on the right and she could not bend more than twenty-five percent.  (*Id.*)

Plaintiff attended physical therapy from March 27, 2007 to November 27, 2007, for lumbar spine pain.  (R. at 462-78.)  Upon initially examined, the physical therapist noted severe lordosis with guarding, a slow gait, and tenderness in the lumbar spine into the hip.  (R. at  474.)  Plaintiff was discharged due to a lack of attendance.  (R. at 462.)

C.    Dr. Mueller

On August 9, 2005, Robert W. Mueller, M.D., an orthopedic and sports medicine specialist, saw Plaintiff on referral from Dr. Malone.  (R. at 282-83.)  Upon examination, Dr. Mueller noted that Plaintiff was morbidly obese, had a positive impingement sign, and tenderness.  (R. at 283.)  He further noted that a recent MRI showed some peri-cuff tenderness as well as A-C joint degeneration/inflamation.  (*Id.*)  Dr. Mueller diagnosed right shoulder impingement and rotator cuff strain, A-C joint pain, and possible carpal tunnel syndrome on the right.  (*Id.*)  He recommended an arthroscopy of the right shoulder, which would include a

subcromial decompression and a distal clavicle excision and possible rotator cuff repair if he found a rotator cuff tear during the arthroscopy.  (*Id.*)

D.     Dr. Terebuh

Boris Terebuh, M.D., evaluated Plaintiff on March 27, 2007 for her lumbar pain.  (R. at 313-14.)  At this time, Plaintiff weighed 352 lbs.  (R. at 313.)  Dr. Terebuh found Plaintiff was very tender to palpation and noted that her pain responses were out of proportion with the stimulation he applied.  (*Id.*)  Examination revealed that pain significantly limited Plaintiff's motion, extension, and flexion; Plaintiff's reflexes were mildly diminished; she had a positive pin prick test; and her gait was mildly antalgic.  (R. at 313–14.)  Dr. Terebuh diagnosed facet joint pain at L4-5 and L5-S1.  (R. at 314.)  Dr. Terebuh discussed the importance of progressively increasing physical activity.  (*Id.*)

On June 8, 2007, Plaintiff reported that her symptoms had worsened.  (R. at 310.)  Plaintiff reported numbness traveling down into her right leg while sitting.  (*Id.*)  Dr. Terebuh noted that "the most important treatment intervention" for Plaintiff's condition was increasing physical activity.  (*Id.*)  Plaintiff received corticosteroid injections on June 13, 2007.  (R. at 309.)  During a June 29, 2007 examination, Dr. Terebuh found tenderness in the lower lumbar region; trunk range of motion painful with extension, but relieved with flexion; normal sensation; absent reflexes; normal motor findings in the distal lower limbs; and a normal gait.  (R. at 305.)  On July 10, 2007 and July 26, 2007, Plaintiff underwent facet joint nerve blocks.  (R. at 306-07.)

On August 30, 2007, Plaintiff indicated a 10% improvement following the facet joint nerve procedures.  (R. at 303.)  She had painful hip joint range of motion, problems transitioning from sitting to standing, and an antalgic gait. (*Id.*)  Plaintiff inquired about an electric

wheelchair, but Dr. Terebuh recommended a walker instead. (*Id.*)

On October 1, 2007, Dr. Terebuh wrote that Plaintiff had chronic lumbar pain associated with degenerative changes and opined that Plaintiff's "body weight is a significant contributing factor to her chronic pain symptoms." (R. at 302.) Dr. Terebuh concluded that "[a] significant weight loss would be expected to help ease the biomechanical burden on the degenerative segments in the lumbar spine and result in an improvement in her chronic pain status." (*Id.*) X-rays of Plaintiff's hips taken on October 11, 2007 were normal. (R. at 321.)

E.    Dr. Goodwin

Plaintiff saw Jeffrey E. Godwin, M.D., from June 5, 2007 to September 27, 2007 for possible sleep apnea. (R. at 322-36.) Two sleep studies revealed mild to moderate obstructive sleep apnea. (R. at 322.) Dr. Godwin prescribed a CPAP machine. (R. at 323.) Dr. Godwin noted on September 27, 2007, that Plaintiff had been noncompliant in quitting smoking and using the Chantix medication he had prescribed. (R. at 322.) He was not optimistic that Plaintiff was going to follow through on his advice. (*Id.*)

F.    Dr. Stokes

Plaintiff received some treatment from Dr. Malcolm Stokes for her depression in 2008. (R. at 459–61.) On March 23, 2009, Dr. Stokes indicated that Plaintiff had missed ten appointments, while only keeping four. (R. at 458.) Dr. Stoke's notes reflect that he diagnosed Plaintiff with major depression and generalized anxiety disorder. (*Id.*)

G.    State Agency Evaluations

State agency physician Esberdado Villanueva, M.D., reviewed the record and provided a physical residual functional capacity assessment on November 20, 2006. (R. at 263–70.) He

opined that Plaintiff could lift/carry up to fifty pounds occasionally and frequently twenty-five pounds frequently. (R. at 264.) She could stand/walk for six hours out of eight and sit for six hours out of eight. (*Id.*) She was limited in her ability to push/pull. (*Id.*) Dr. Villanueva based these opinions on Plaintiff's 2005 MRI results demonstrating right shoulder rotator cuff tendinosis, mild impingement syndrome, and mild degenerative changes in the facet joints at L4-5 and L5-S1. (*Id.*) Additionally, Dr. Villanueva opined that Plaintiff was never to climb ladders, ropes, and scaffolds; had a limited ability to reach in all directions; and was to avoid concentrated exposure hazards. (R. at 265–67.) Dr. Villanueva noted that Plaintiff's symptoms were attributable to a medically determinable impairment, the severity or duration of the symptoms were not disproportionate to the expected severity of expected duration on the basis of the her medically determinable impairments, and that her allegations were consistent to the objective medical evidence. (R. at 268.) On March 27, 2007, Diane Manos, M.D., reviewed the record at the request of the State agency and affirmed Dr. Villanueva's assessment. (R. at 281.)

James C. Tanley, Ph.D., conducted a clinical interview of Plaintiff in June 2009. (R. at 504–11.) Dr. Tanley found Plaintiff to be unimpaired in her ability to relate to others, understand and follow simple instructions, and maintain attention to perform simple/repetitive tasks. (R. at 506.) He found Plaintiff's ability to withstand the stress of daily work to be moderately impaired. (*Id.*) Dr. Tanley diagnosed Plaintiff with adjustment disorder with depressed mood. (*Id.*) He concluded Plaintiff was moderately limited in being able to make complex work-related decisions, but only mildly limited in understanding, remembering, and carrying out simple instructions. (R. at 508.) He opined that Plaintiff was moderately limited in her ability to interact appropriately with the public, supervisors, and co-workers. (R. at 509.)

Dr. Tanley also concluded Plaintiff was moderately limited in responding appropriately to usual

work situations and changes in routine work setting.  (*Id.*)

## IV. EXPERT TESTIMONY

Vanessa Harris testified as a vocational expert at the administrative hearing.  (R. at

46–50.)  The ALJ asked Ms. Harris to consider a person at the sedentary level with various other

limitations that the ALJ later incorporated into his RFC.  Ms. Harris opined that such a person

could perform about 3,500 jobs in the relevant region.  Ms. Harris further opined that, if

accepted, the restrictions Dr. O'Connor assigned to Plaintiff were work preclusive.

## V.  ADMINISTRATIVE DECISION

The ALJ found that Plaintiff was not disabled within the meaning of the Social Security

Act in his August 28, 2009 decision.  The ALJ found that Plaintiff met the insured status

requirements of the Social Security Act through March 31, 2010.  (R. at 12.)  At the first step of

the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantial

---

[3]  Social Security Regulations require ALJs to resolve a disability claim through a
five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a
dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d
727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five
questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or
    equal the criteria of an impairment set forth in the Commissioner's Listing
    of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and
    residual functional capacity, can the claimant perform other work
    available in the national economy?

gainful activity since the January 29, 2005 alleged disability onset date.  (*Id.*)

Next, the ALJ found that Plaintiff has the severe impairments of lumbar degenerative disc disease, morbid obesity, sleep apnea, right shoulder rotator cuff impingement, loss of right ear hearing, and depressive disorder NOS.  (Id.)  At step three, the ALJ then determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. at 14.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ concluded that Plaintiff has the ability to perform a reduced range of sedentary work.  (R. at 16-17.)  The ALJ concluded that Plaintiff lacked the capacity to:

> [L]ift more than five pounds frequently or ten pounds occasionally; 2) stand and walk combined more than two hours in an eight hour work day; 3) crawl or climb ladders or scaffolds; 4) do greater than occasional crouching, stooping, kneeling, or reaching above shoulder level; 5) work at unprotected heights or around moving machinery, or where there is considerable background noise; 6) have greater than occasional contact with the public, supervisors, or co-workers; or 7) do other than low stress work activity (i.e., no job involving fixed production quotas or otherwise involving above average pressure for production, work that is other than routine in nature, or work that is hazardous).

(*Id.*)

In reaching his conclusions regarding Plaintiff's RFC, the ALJ found that Plaintiff's herniated disc condition in the lumbar spine with nerve root impingement, the combination of her significant obesity and back pain, and her shoulder condition all limited Plaintiff's ability to perform work.  (R. at 17.)  The ALJ also concluded that the effects of Plaintiff's mental

---

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

impairments reduced her ability to work.  (*Id.*)  The ALJ gave Dr. O'Connor's opinion little

weight, finding that Dr. O'Connor's own physical examination findings did not support his

restrictions.  (R. at 19.)  The ALJ explicitly noted that no controlling or deferential weight can be

given to the opinion of Dr. O'Connor in view of its lack of supportability in the medical record.

(*Id.*)  The ALJ also rejected the opinion of state agency reviewer that Plaintiff could perform

medium work, because he was unaware of Plaintiff's significant low back condition at the time

of his review.  (R. at 18.)  Finally, the ALJ found Plaintiff to be not credible to the extent her

testimony was inconsistent with the RFC assessment.  (R. at 19-20.)

Based on the above RFC and the vocational expert's testimony, the ALJ found that

Plaintiff could not perform her past relevant work.  (R. at 20.)  Nevertheless, applying the

Medical Vocational Guidelines as a frame of reference, and relying on the vocational expert

testimony, the ALJ found that Plaintiff could perform a significant number of jobs in the national

economy.  (R. at 21.)  Accordingly, the ALJ found that Plaintiff was not disabled within the

meaning of the Social Security Act.  (R. at 22.)

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.

1997)).  Finally, even if the Commissioner's decision meets the substantial evidence standard,

"'a decision of the Commissioner will not be upheld where the SSA fails to follow its own

regulations and where that error prejudices a claimant on the merits or deprives the claimant of a

substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d

742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

Plaintiff sets forth two issues in her Statement of Errors.  First, Plaintiff maintains that

the

ALJ erred in rejecting the opinions of Dr. O'Connor, her treating physician, who had assessed

Plaintiff's RFC.  Within this first contention of error, Plaintiff also indicates that in reaching his

decision, the ALJ substituted his own medical judgment in place of Dr. O'Connor's opinion.

Second, Plaintiff contends that the ALJ erred in finding that Plaintiff was not credible.  For the

reasons that follow, the undersigned concludes that the ALJ erred by relying on his own medical judgment in weighing Dr. O'Connor's opinion and determining Plaintiff's RFC. Accordingly, remand is necessary.[4]

A.  Treating Physician Opinions

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(d). Certain types of opinions, however, are normally entitled to greater weight. (*Id.*) For example, the ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . ." 20 C.F.R. § 404.1527(d)(2); *Blakley*, 581 F.3d at 408.

If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In contrast, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent the with other substantial evidence in the case record.'" *Blakley*, 581 F.3d at 406 (quoting SSR 96-2p, 1996 WL 374188, at *2 (July 2, 1996)). Even when an ALJ does not grant a treating physician's opinion controlling weight, "the ALJ must still determine how much weight is appropriate by

---

[4] Because the undersigned finds that the ALJ erred in assessing the opinion evidence and that remand is appropriate, the undersigned finds it unnecessary to determine whether the ALJ erred in assessing Plaintiff's credibility.

considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, [and the] supportability of the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(d)(2).

"While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his own lay 'medical' opinion for that of a treating or examining doctor." *Beck v. Comm'r of Soc. Sec.*, No. 1:10–cv–398, 2011 WL 3584468, at *14 (S.D. Ohio June 9, 2011) (Report & Recommendation later adopted).  It is well established that "an ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Simpson v. Comm'r of Social Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (internal quotations omitted) (holding that an ALJ improperly relied upon his own medical judgment in determining that the degree of pain resulting from claimant's pelvic adhesions, with otherwise normal examinations, could not plausibly lead to the restrictions the claimant's treating physician assigned); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); *Bledsoe v. Comm'r of Social Sec.*, No. 1:09cv564, 2011 WL 549861, at *7 (S.D. Ohio Feb. 8, 2011) ("An ALJ is not permitted to substitute her own medical judgment for that of a treating physician and may not make her own independent medical findings."); *Brewer v. Astrue*, No. 1:10–cv–01224, 2011 WL 2461341, at *6 (N.D. Ohio June 17, 2011) (holding that ALJ's finding that a treating psychiatrist's opinion was inconsistent with his treatment notes,

constituted an insufficient interpretation of the medical data by the ALJ).

Finally, in weighing medical opinion evidence, the ALJ reserves the right to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Nevertheless, the ALJ must consider medical source opinions regarding the severity of a claimant's impairments. *Id.* Additionally, this Court has noted on at least one occasion, "[t]he residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'" *Isaacs v. Astrue*, No. 1:08-CV-00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)).[5]

In this case, the opinions of Dr. O'Connor, Plaintiff's treating physician, were more severe than the RFC the ALJ ultimately assigned.[6] Specifically, Dr. O'Connor opined that

---

[5] The Court recognizes some disagreement between district courts within this Circuit as to the extent an ALJ must rely on opinion evidence in reaching an RFC determination. *Compare Deskin*, 605 F. Supp. 2d at 912 (suggesting that although an ALJ may sometimes rely on commonsense judgment, when a claimant's functional ability is genuinely at issue an ALJ must ordinarily rely on a medical source's evaluation of the RFC); *with Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (questioning *Deskin* and emphasizing that an ALJ may consider medical evidence other than opinion testimony in determining a claimant's RFC). The undersigned finds it unnecessary to weigh in on this general debate. As described further below, the undersigned simply concludes that given the complexity of the medical records in this case, substantial evidence does not support the ALJ's reliance on his own personal interpretation of the medical data.

[6] Dr. O'Connor gave opinions with regard to both Plaintiff's physical and mental abilities. In weighing Dr. O'Connor's mental impairment opinions, the ALJ relied on contrary opinion evidence from Dr. Tanley. Within her Statement of Errors, however, Plaintiff has focused on the ALJ's rejection of the physical limitations Dr. O'Connor assigned. Accordingly, the undersigned reaches no decision as to the ALJ's rejection of Dr. O'Connor's opinions relating to Plaintiff's mental limitations.

Plaintiff would only be able to sit two hours in an eight hour workday; could lift no more than five pounds either occasionally or frequently; should never stoop, crouch, or kneel; and would have to be absent more than three times a month due to her impairments. In assessing Plaintiff's RFC, the ALJ deviated from Dr. O'Connor's opinion in multiple ways.[7] For example, the ALJ did not assign a sitting restriction despite Dr. O'Connor's opinion that Plaintiff could only sit for two hours in a workday. The ALJ explained that he gave Dr. O'Connor's physical limitation opinions little weight because they lacked support from the medical record. The ALJ provided two main reasons for this conclusion. First, the ALJ found that Dr. O'Connor's physical examinations and treatment notes did not support the restrictions he assigned. The ALJ suggested that Dr. O'Connor's examinations reported various unremarkable findings including normal range of motion. Second, the ALJ criticized Dr. O'Connor for failing to provide significant justification within the opinion form he submitted. The ALJ noted that Dr. O'Connor "simply wrote in some physical restrictions, including just two hours of sitting and two hours of standing a day, without elaboration . . . ." (R. at 19.)

The ALJ's rejection of Dr. O'Connor's opinions is not supported by substantial evidence. Specifically, in giving little weight to Dr. O'Connor's opinions, the ALJ substituted his own medical judgment for that of Dr. O'Connor. The record in this case documents Plaintiff's extensive medical history, including over three years of examination notes describing Dr. O'Connor's regular treatment of Plaintiff. Plaintiff has received treatment for various conditions including back and shoulder complications. She is also morbidly obese. A January 2007 MRI,

---

[7] Such deviations proved critical, as the vocational expert testified that Dr. O'Connor's restrictions would be work preclusive. (R. at 50.)

which Dr. O'Connor ordered, revealed "[l]eft paramidline and foraminal disc herniation at L4-5 impinging on the left L4 nerve root and the foramen" as well as "[d]egenerative changes in the facet joints . . . bilaterally at L4-5 and L5-S1." (R. at 277.) In rejecting Dr. O'Connor's opinions, the ALJ selectively highlighted normal findings within Dr. O'Connor's treatment notes. Dr. O'Connor's examination, however, also routinely revealed problematic and abnormal findings including paraspinal spasms, vertebral spine tenderness, and tenderness on the SI joints. (*See* R. at 401-57.) Finally, the record contains no medical-source opinion evidence suggesting that Dr. O'Connor's opinions lack support.

Given the relatively complex combination of Dr. O'Connor's treatment notes and Plaintiff's test results, as well as the lack of medical-source opinion evidence addressing Dr. O'Connor's opinions, it is not readily apparent from the record that Dr. O'Connor's opinions lack medical support. Rather, it appears the ALJ was relying on his own personal medical judgment in concluding that the Dr. O'Connor's examinations and treatment notes did not justify his opinions. Because the ALJ is not a medical expert, his conclusion lacks support.

Relatedly, the ALJ's physical RFC determination also appears to be a product of his own lay medical judgment. The record contains, and the ALJ addressed, two medical source opinions detailing Plaintiff's functional limitations.[8] Dr. Villanueva opined that Plaintiff could work at the medium exertional level, with few postural limitations. The ALJ justifiably rejected the

---

[8] Within her treatment notes, Dr. Malone did provide a few "Employee Work Status Report" forms. Between October 2004 to March 2006, Dr. Malone varied in whether she found Plaintiff able to return to work. (*See, e.g.*, 353, 355, 357, 399.) These forms generally offer little detail regarding Plaintiff's functional limitations, and Dr. Malone filled in these forms prior to the January 2007 MRI showing a herniated disc. Furthermore, the ALJ did not identify Dr. Malone's opinions as a basis for his RFC determination.

opinion that Plaintiff could work at the medium level because Dr. Villanueva was not aware of the full extent of Plaintiff's low back condition. Nevertheless, as detailed above, the ALJ also gave the opinions of Dr. O'Connor little weight. Ultimately, the ALJ's assigned RFC does not track, or appear to credit, any medical opinion evidence. Nor does the ALJ's RFC appear to be a compromise based on the weighing of different RFC assessments.

As the ALJ's "Evidentiary Basis for Residual Functional Capacity" section suggests, the ALJ's physical RFC determinations are apparently founded on the ALJ's personal interpretation of what functional limitations should result from the medical data. (*See* R. at 17.) The undersigned recognizes that the ALJ also partially based his RFC on the finding that Plaintiff was not entirely credible. Even recognizing this credibility assessment, however, the ALJ's own written decision indicates that he based his RFC determination in large part on his own consideration of what physical limitations the medical data justified. (*See id.*) Once again, given the relative complexity of Plaintiff's conditions and the medical record in this case, the ALJ erred in relying on his own medical interpretations to reach his RFC determination.

Finally, to the extent the ALJ rejected Dr. O'Connor's opinions for a lack of elaboration, this reasoning is also unavailing. It is true that an ALJ is not bound by conclusory, unsupported statements of doctors. *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 441 (6th Cir. 2010). Within the actual physical work-related activities opinion form he submitted, Dr. O'Connor was terse, only referencing Plaintiff's pain and obesity as findings supporting his physical limitation assessments. Nevertheless, when viewed in context of the various medical records Dr. O'Connor submitted, it is apparent that these opinions were founded on an extensive treating relationship, including various physical examinations and test results. *See Cox v. Barnhart*, 345

F.3d 606, 609 (8th Cir. 2003) (holding that treating physician's opinion letter could not be rejected as conclusory when "[v]iewed in context of her medical record, [the] letter is a culmination of the numerous visits [the claimant] had with her past doctors"); *Williams v. Astrue*, No. ED CV 08-549, 2010 WL 431432, at *5 (Feb. 1, 2010) (holding that when the treating physicians opinion form was viewed in combination with his treatment notes, rather than in isolation, the treating physicians opinions were not vague or conclusory); *Cf. also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (providing that a doctors "statements must be read in context of the overall diagnostic picture he [or she] draws"). Furthermore, Dr. O'Connor did not simply opine that Plaintiff was unable to work or limited to a specific exertional level. Rather, in filling out the form, Dr. O'Connor provided specific functional limitations. (R. at 338–41.) Under these circumstances, the ALJ was not justified in rejecting Dr. O'Connor's opinions as overly vague or conclusory.

Accordingly, the ALJ erred in giving little weight to Dr. O'Connor's physical limitation opinions in reaching his ultimate RFC determination. Because the ALJ relied on his own medical opinions, substantial evidence does not support his decision.[9]

B.    Remand

If substantial evidence does not support the Commissioner's decision, the Court must

---

[9]    In opposing Plaintiff's Statement of Errors, Defendant relies heavily on *Blanch v. Sec'y of Health & Human Servs.*, 927 F.2d 228 (6th Cir. 1990) for the proposition that the Sixth Circuit has affirmed a non-disability finding where a claimant had more significant back impairments than those of Plaintiff. This decision, however, is not controlling under the circumstances of this case. The *Blancha* decision contained limited discussion of the medical evidence within the record, making it unclear whether the claimant actually had more significant impairments than Plaintiff. Furthermore, the *Blancha* decision did not explicitly address the treating physician rule nor did it consider whether the ALJ substituted his or her own medical judgment for that of a physician.

decide the nature of remand. The Court has the discretion to enter "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The United States Court of Appeals for the Sixth Circuit has emphasized that "[i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). In other terms, "[a] judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Kennedy v. Astrue*, 247 F. App'x 761, 768 (6th Cir. 2007).

As detailed above, the ALJ erred because he relied on his own medical judgment in determining the supportability of Dr. O'Connor's opinion. Nevertheless, this determination does not necessarily mean that the ALJ's ultimate conclusion was incorrect. *Cf. Brewer*, 2011 WL 2461341, at *6 ("Although the ALJ's assumption appears reasonable to a lay person and might ultimately be correct, he has no special expertise to make such an assumption."). Given the circumstances of this case, and specifically the limited amount of opinion evidence in the current record, the undersigned is unwilling to conclude that all essential factual issues have been resolved. Accordingly, remand is proper.

## VIII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** this case for further proceedings consistent with this Report and Recommendation.

# IX. NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   January 26, 2012                                  /s/ *Elizabeth A. Preston Deavers*
                                                       Elizabeth A. Preston Deavers
                                                       United States Magistrate Judge